696 A.2d 85

ATLANTIC COMMERCIAL GROUP, INC., PLAINTIFF–APPEL-
LANT, v. GEORGE W. DUNHAM, III, AND BARBARA A.
DUNHAM, DEFENDANTS–RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued May 28, 1997—Decided July 8, 1997.

Before Judges MICHELS, KLEINER and COBURN.

*Joel M. Doner* argued the cause for appellant (*Doner and Castro*, attorneys; *Mr. Doner*, of counsel and on the brief).

*Richard J. Jubanyik* argued the cause for respondents (*Dilworth, Paxson, Kalish & Kauffman*, attorneys; *Mr. Jubanyik*, of counsel and on the brief).

*Arthur M. Greenbaum* argued the cause for *amicus curiae* New Jersey Association of Realtors (*Greenbaum, Rowe, Smith, Ravin, Davis & Himmel,* attorneys; *Mr. Greenbaum,* of counsel; *Mr. Greenbaum* and *Bruce D. Greenberg,* on the brief).

The opinion of the court was delivered by

MICHELS, P.J.A.D.

Plaintiff Atlantic Commercial Group, Inc. appeals from a summary judgment of the Law Division entered in favor of defendants George W. Dunham, III and Barbara A. Dunham in this action to recover real estate commissions in connection with the sale of commercial property in Cape May County, New Jersey. This appeal primarily concerns *N.J.S.A.* 45:15–3, which precludes any real estate broker from suing for commissions "without alleging and proving that he was a duly licensed real estate broker at the time the alleged cause of action arose." The pivotal issue is whether that provision bars an action by a broker who was licensed when he rendered his real estate brokerage services in a transaction that resulted in an option contract, but whose license had lapsed by the time of the actual closing of title years later. The trial court held that pursuant to *N.J.S.A.* 45:15–3, the broker's unlicensed status at the time of the closing precluded its suit for commissions even though the broker had been licensed at all times while performing the relevant brokerage services. We disagree and now reverse.

Plaintiff, a New Jersey licensed real estate brokerage corporation, was retained by defendants in the summer of 1988 to represent them in connection with the sale of their commercial property, a marina known as "Dad's Place," located in Wildwood, New Jersey. On June 28, 1988, plaintiff and defendants signed a listing agreement. In October 1988, plaintiff's employees, Bruce M. Doner and Edward Temple, New Jersey licensed real estate brokers, found buyers, Luke, Mary Ann, and Mars Anagnou (the Anagnous), for the marina. On October 31, 1988, defendants and Luke and Mary Ann Anagnou executed a written contract for the

sale of the property. The closing on the marina was scheduled for November 30, 1988; however, the closing did not occur on that date. The reason that the closing did not occur is in dispute.

It is uncontroverted that defendants did not have good marketable title to convey at the time of the closing. Defendants testified that they had unmarketable title because the State claimed title to a portion of their property due to a riparian right in a stream that previously had been filled. Defendants, however, contend that there was no reason for them to clear the title to the property because the buyers were unable to close title since they (the buyers) could not obtain the necessary financing. Although they stated that the closing did not occur because the buyers could not obtain financing, defendants eventually acknowledged that the buyers had obtained financing, but simply had not signed the mortgage commitment.

Plaintiff, on the other hand, contends that the closing did not occur solely because defendants did not have marketable title. Plaintiff claimed that the buyers were ready, willing, and able to close on the designated date. In his deposition, Mars Anagnou testified that the Anagnous had received a mortgage commitment from a bank prior to the closing date. Mars Anagnou asserted that the only reason that they did not close title was because defendants could not produce a marketable title. Mars Anagnou also explained that he and his father only lost their mortgage commitment after 1989. An addendum to the contract for sale appears to indicate the reason the closing did not occur was because defendants did not have clear title, rather than because the buyers were unable to obtain financing.

In any event, the closing of title did not occur in 1988. Instead, on March 6, 1989, defendants and the Anagnous, with plaintiff's assistance, entered into a lease purchase agreement by adding an addendum to their original sales agreement. The lease agreement was for a term of five years and granted the Anagnous an option to buy the marina at an agreed upon price. Thereafter, the Anagnous took possession of the marina. Defendants paid plain-

tiff six percent of all rent payments they received from the Anagnous over the next five years. The rents defendants received were not put towards the Anagnous' ultimate sale price, but the commissions that plaintiff received on the rent paid were to be applied towards any commission that may be due plaintiff on the future sale of the marina.

Soon after entering into the lease, the Anagnous fell behind in their rent payments. Thus, by January 1994, the Anagnous owed defendants approximately $45,000 in back rent and $12,000 in real estate taxes. Initially, defendants asked plaintiff to help them collect the rent from the Anagnous. As a result, Temple contacted the Anagnous, but the Anagnous still did not make the necessary rent payments.

Towards the end of 1993, John Lemisch, defendants' financial advisor and agent, contacted the Anagnous to inquire whether they were going to purchase the marina or whether they wanted to get out of the deal. The Anagnous indicated that they wanted to buy the marina. Nonetheless, defendants decided to retake possession and operate the marina. As a result, a meeting was scheduled between defendants and the Anagnous for February 23, 1994. The record is not entirely clear as to the status of the lease at the time of the February 1994 meeting. Yet, the meeting took place on the scheduled date, and the Anagnous and their attorney, defendants and their attorney, and Lemisch were present. Plaintiff's agents did not attend the meeting. Defendants claimed that the purpose of the meeting was to set up a procedure for them to retake possession and operate the marina. Nevertheless, during the meeting, Luke Anagnou made an impassioned plea to defendants to give his family another opportunity to purchase the marina, and defendants acquiesced. As a consequence, the Anagnous paid all rent arrearages due; plaintiff was paid a commission on this rent payment.

On March 14, 1994, defendants and the Anagnous entered into a new lease purchase agreement. Plaintiff was not involved with the new agreement. The new agreement provided for structured

rent payments so that the Anagnous could pay a greater amount of rent in the summer, thereby taking into account the seasonality of the marina business. It also required the Anagnous to pay a security deposit to defendants and gave defendants a security interest in property at the marina. The agreement recited a purchase price of $585,000, which was less than the original purchase price of $622,179. Yet, the parties and the property were the same as those in the first lease purchase agreement. No provision was made in the new lease purchase agreement for commissions to be paid to plaintiff. In fact, Lemisch advised defendants before they entered into the new agreement that they would not have to pay plaintiff any commission on any future sale. In September 1994, the Anagnous closed title to the marina, and no commission was paid to plaintiff. At the time of closing, plaintiff was not a licensed New Jersey real estate broker, as its license had expired on February 15, 1992.

Plaintiff instituted this action against defendants to recover the commissions allegedly due as a result of the sale of the marina to the Anagnous. After issue was joined and pretrial discovery completed, plaintiff and defendants each moved for summary judgment. Defendants claimed that (1) plaintiff's action was barred under *N.J.S.A.* 45:15–3; (2) plaintiff was not entitled to commissions under the clear language of the lease purchase agreement; and (3) plaintiff was not entitled to commissions because it was not the efficient producing cause of the September 1994 sale of the marina. Following argument, the trial court granted defendants summary judgment on the ground that plaintiff's cause of action arose when the closing occurred in September 1994, and since plaintiff was not a licensed real estate broker at that time, its action for commissions was barred by *N.J.S.A.* 45:15–3. The trial court did not consider the other grounds raised by defendants. Plaintiff appealed.

Plaintiff seeks a reversal of the summary judgment, contending that (1) the trial court erred in holding that its cause of action arose at the time of closing of title for purposes of *N.J.S.A.* 45:15–

3, rather than when it had completed its brokerage services under the option contract for the sale of the marina, and (2) it is entitled to recovery as a matter of law because it was the efficient producing cause of the sale of defendant's property. *Amicus curiae*, the New Jersey Association of Realtors (the Realtors), asserts an argument identical to plaintiff's first contention.

*N.J.S.A.* 45:15–1 to –29.5, the Real Estate Brokers and Salesmen Act (the Act), governs real estate brokers and salespersons. This act was originally passed in 1921 and has been amended many times since. *N.J.S.A.* 45:15–3, in pertinent part, provides:

> No person, firm, partnership, association or corporation shall bring or maintain any action in the courts of this State for the collection of compensation for the performance of any of the acts mentioned in this article without alleging and proving that he was a duly licensed real estate broker at the time the alleged cause of action arose.

This paragraph was added to *N.J.S.A.* 45:15–3 in 1953. *L.* 1953, *c.* 229, § 2.

In interpreting a statute, a court should generally apply the clear, plain language of the statute. *In re Township of Howell,* 254 *N.J.Super.* 411, 419, 603 *A.2d* 959 (App.Div.), *certif. denied,* 127 *N.J.* 548, 606 *A.2d* 362 (1991). *See also M.P. by D.P. v. Wee Care Day Nursery of Maplewood and S. Orange, Inc.,* 250 *N.J.Super.* 119, 123, 593 *A.2d* 799 (App.Div.1991) ("[W]hen no ambiguities, inconsistencies or anomalies are presented by statutory language, a court should delve no further than an act's literal terms to divine legislative intent." (citation omitted)). Yet, " 'a court's duty in construing a statute is to determine the intent of the Legislature.' " *Jacobitti v. Jacobitti,* 135 *N.J.* 571, 579, 641 *A.2d* 535 (1994) (quoting *AMN, Inc. v. Township of S. Brunswick Rent Leveling Bd.,* 93 *N.J.* 518, 525, 461 *A.2d* 1138 (1983)). To that end, "[s]tatutory language, the policy behind the statute, concepts of reasonableness and legislative history are sources of legislative intent." *King ex rel. King v. Brown,* 221 *N.J.Super.* 270, 275, 534 *A.2d* 413 (App.Div.1987) (citations omitted).

Accordingly, "a court should avoid a literal interpretation of individual statutory terms or provisions that would be inconsis-

tent with the overall purpose of the statute." *Young v. Schering Corp.*, 141 *N.J.* 16, 25, 660 *A.*2d 1153 (1995). In other words, a court should "enforce the legislative will even when the language of the statute is in conflict therewith." *In re Determination of Executive Comm'n on Ethical Standards*, 116 *N.J.* 216, 227, 561 *A.*2d 542 (1989) (citation omitted). "In ... interpreting a statute, primary regard must be given to the fundamental purpose for which the legislation was enacted. Where a literal rendering will lead to a result not in accord with the essential purpose and design of the act, the spirit of the law will control the letter." *New Jersey Builders, Owners and Managers Ass'n v. Blair*, 60 *N.J.* 330, 338, 288 *A.*2d 855 (1972). Moreover, " '[s]tatutes [should] not be interpreted in a manner leading to absurd or unreasonable results.' " *Reisman v. Great Am. Recreation, Inc.*, 266 *N.J.Super.* 87, 96, 628 *A.*2d 801 (App.Div.1993) (alterations in original) (quoting *534 Hawthorne Ave. Corp. v. Barnes*, 204 *N.J.Super.* 144, 148, 497 *A.*2d 1265 (App.Div.1985)), *certif. denied*, 134 *N.J.* 560, 636 *A.*2d 519 (1993).

The purpose of the Act, *N.J.S.A.* 45:15–1 to –29.5, "is to protect consumers by excluding 'undesirable, unscrupulous and dishonest persons ... from the real estate business.' " *Kazmer–Standish Consultants, Inc. v. Schoeffel Instruments Corp.*, 89 *N.J.* 286, 290, 445 *A.*2d 1149 (1982) (omission in original) (quoting *Statement to Assembly Bill 143* (1921)). *See also Tobias v. Comco/America, Inc.*, 96 *N.J.* 173, 180, 475 *A.*2d 40 (1984). The Act is intended "to protect the public from fraud, misrepresentation, incompetence and sharp practice." *Stahl v. Township of Teaneck*, 162 *F.Supp.* 661, 669 (D.N.J.1958). Moreover, in regard to *N.J.S.A.* 45:15–3 specifically, " 'the public policy of this State is not to lend unlicensed brokers the aid of the courts to enforce their brokerage agreements.' " *Palkoski v. Garcia*, 32 *N.J.Super.* 343, 347, 108 *A.*2d 271 (App.Div.1954) (quoting *Solomon v. Goldberg*, 11 *N.J.Super.* 69, 78 *A.*2d 118 (App.Div.1950)), *aff'd*, 19 *N.J.* 175, 115 *A.*2d 539 (1955). "[T]he legislative objective in closing the courts to the unlicensed broker was to establish a

policy so strong that neither the contract nor the unlawful efforts made in its pursuit could provide [a] basis of pecuniary benefit to [a broker]. . . ." *Tanenbaum v. Sylvan Builders, Inc.,* 29 *N.J.* 63, 71–72, 148 *A.*2d 176 (1959).

 Armed with these fundamental principles, we are satisfied that the provision of *N.J.S.A.* 45:15-3, which requires that a real estate broker be duly licensed "at the time the alleged cause of action arose" should be construed to mean that the broker seeking commissions for the performance of brokerage services must be duly licensed at the time the brokerage services were performed and completed. We do not construe the language "at the time the cause of action arose" to mean at the time of closing of title. While a broker may not have earned his commission until such time, there is no sound or just reason why a broker who was duly licensed when the brokerage services were performed and completed should not be entitled to a commission for such services simply because the broker was not licensed at the time of closing. To deny the broker the commission in such circumstances is both unfair and inequitable and would lead to a windfall to the seller because the seller would not have to pay a commission which was justly due and owing. *See, e.g., Bersani v. Basset,* 184 *A.D.*2d 996, 585 *N.Y.S.*2d 245, 246 (1992) ("The licensing requirement for real estate brokers is intended to protect the public from inept, inexperienced or dishonest persons, not to permit others to take advantage of a violation of the statute to escape their obligations." (citations omitted)). *See also Galbreath–Ruffin Corp. v. 40th and 3rd Corp.,* 19 *N.Y.*2d 354, 280 *N.Y.S.*2d 126, 131–32, 227 *N.E.*2d 30, 34 (1967).

Our construction of this provision of *N.J.S.A.* 45:15-3 is not inconsistent with nor does it offend the policy underlying the legislative purpose of the enactment. The policy reasons behind the provision—protecting the public from misrepresentation, incompetence, and sharp practice—are served as long as the broker is licensed when he or she performs the required and necessary

services in a transaction. They are not furthered by requiring the broker to be licensed after completing the brokerage services.

It must be remembered that when the relevant paragraph was added to *N.J.S.A.* 45:15–3 in 1953, it was settled law in New Jersey that "when a broker who had been duly authorized by [a property] owner to find a buyer for his property produced a willing and able purchaser who entered into a contract to buy on terms agreeable to the owner, the broker had fulfilled his undertaking and his right to commission from the owner was complete." *Ellsworth Dobbs, Inc. v. Johnson,* 50 *N.J.* 528, 543, 236 *A.2d* 843 (1967). *See also Blau v. Friedman,* 26 *N.J.* 397, 401, 140 *A.2d* 193 (1958); *Alnor Constr. Co. v. Herchet,* 10 *N.J.* 246, 253, 90 *A.2d* 14 (1952); *Feist & Feist, Inc. v. Taub,* 105 *N.J.L.* 237, 238, 143 *A.* 335 (E. & A.1928); *Richard v. Falleti,* 13 *N.J.Super.* 534, 536, 81 *A.2d* 17 (App.Div.1951); *Hinds v. Henry,* 36 *N.J.L.* 328, 332 (Sup.Ct. 1873). Thus, when the relevant paragraph was passed, a broker could essentially bring a cause of action for commissions once he or she performed his or her necessary brokerage services. In 1967, however, our Supreme Court in *Ellsworth Dobbs, Inc. v. Johnson, supra,* 50 *N.J.* at 551–52, 236 *A.2d* 843, altered the rule as to when a broker earned commissions. It was only after that decision that a real estate broker did not earn his commission until the closing occurred or the seller defaulted. *Ibid.* Consequently, when it inserted the pertinent language into *N.J.S.A.* 45:15–3 in 1953, the Legislature could not have intended the language "at the time the alleged cause of action arose" to mean at the time that title closed under the contract of sale.

Finally, and importantly, the construction that we place upon the pertinent provision of *N.J.S.A.* 45:15–3 is consistent with the construction placed upon that paragraph by the New Jersey Real Estate Commission (the Commission), which is charged with enforcing the Act. *See Tobias v. Comco/America, Inc., supra,* 96 *N.J.* at 180, 475 *A.2d* 40. Although the Commission's position is not binding on this court, "[a]n administrative agency's interpretation of a statute it is charged with enforcing is entitled to great

weight." *In re Application of the Borough of Saddle River,* 71 *N.J.* 14, 24, 362 *A.*2d 552 (1976) (citation omitted). *See also Waste Management of Cent. Jersey, Inc. v. State,* 278 *N.J.Super.* 56, 64, 650 *A.*2d 379 (App.Div.1994). In other words, this court gives such an interpretation "special deference." *In re Tavani,* 264 *N.J.Super.* 154, 158, 624 *A.*2d 75 (App.Div.1993) (citation omitted).

In *N.J.A.C.* 11:5–1.10(i), the Commission construed *N.J.S.A.* 45:15–3 in the following manner:

(i) Broker and salesperson licensees may only bring or maintain actions in the courts of New Jersey for the payment of compensation due them for brokerage services performed as provided in *N.J.S.A.* 45:15–3.

1. The Commission interprets the language "at the time the alleged cause of action arose" as used in *N.J.S.A.* 45:15–3 to mean at the time that the brokerage services which form the basis for the alleged claim to compensation were rendered. For example, at the time when a property was listed for sale or rental by a licensee.

2. The Commission does not interpret the language "at the time the alleged cause of action arose" as requiring that the licensee must have been actively licensed at the time that the compensation allegedly due was to have been paid. For example, the Commission does not construe the language as requiring licensure at the time of the renewal of the lease to enable a claimant to sue for compensation based upon a promise, made or in effect when the lease was originally executed, to pay additional consideration to the claimant in the event that the lease was renewed.

The Commission has construed *N.J.S.A.* 45:15–3 to mean that the broker need not be actively licensed at the time that the compensation allegedly due was to be paid in order to sue for his or her commission. Rather, the Commission has deemed that the broker must only be licensed at the time he or she renders the brokerage services which form the basis of the alleged claim for compensation. *Cf. Leadership Real Estate, Inc. v. Harper,* 271 *N.J.Super.* 152, 169–70, 638 *A.*2d 173 (Law Div.1993).

In summary, we construe *N.J.S.A.* 45:15–3 to mean that in order to be able to maintain an action for a commission, a broker need not be licensed at the time that the title closing occurs as long as he or she is duly licensed at the time he or she performs and completes the brokerage services in connection with the transaction. We, therefore, reverse the summary judgment in

favor of defendants and remand the matter to the trial court for further proceedings. We do not reach the issue of whether defendants breached the contract of sale with the Anagnous when defendants did not produce a marketable title. We note, however, that genuine issues of material fact were raised in this regard, including whether defendants knew the status of the State's riparian right claim when they entered into the contract of sale with the Anagnous, and whether the Anagnous were ready, willing, and able buyers in that they had the financial resources to close title. And, finally, we do not reach the issue of whether plaintiff was the efficient producing cause of the ultimate sale of the marina by defendants to the Anagnous.

Accordingly, the summary judgment is reversed and the matter remanded to the trial court for further proceedings consistent with the views expressed herein.